IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CRYSTOL SELADOKI,

    Plaintiff,

    vs.

BELLAIRE LOCAL SCHOOL
DISTRICT BOARD OF EDUCATION,

    Defendant.

Case No. C2-07-1272
Judge Edmund A. Sargus, Jr.
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

This matter began when Plaintiffs filed a due process complaint pursuant to the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400, *et seq.*, against Defendant, Bellaire Local School District ("School District"). Following a five day due-process hearing, an Independent Hearing Officer ("IHO") found that Christian's 2006-2007 individualized education program provided him with a free appropriate public education. As such, the IHO determined that Plaintiffs were not entitled to reimbursement for their unilateral private placement of Christian at Augusta Levy. Plaintiffs appealed the decision to the State Level Review Officer ("SLRO"), who upheld the decision of the IHO in all respects.

Plaintiffs now appeal the SLRO's decision under the IDEIA and seek a judicial review of the administrative due process proceedings. Plaintiffs also assert separate claims under the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"). This matter is before the Court for consideration of Defendant Bellaire Local

School District's Motion for Judgment on the Administrative Record on Count I of Plaintiffs' complaint under the IDEIA and Motion for Partial Judgment on the Pleadings on Plaintiffs' remaining statutory claims in Counts II through IV. For the reasons that follow, Defendant's Motion for Judgment on the Administrative Record is **GRANTED**. The Court provides notice that it intends to convert Defendant's Motion for Partial Judgment on the Pleadings to one for summary judgment and the parties are granted leave to supplement the record.

## I.

Plaintiff, Christian Seladoki, was born on June 6, 2000. At all times relevant to this case, Christian resided in Bellaire, Ohio with his parents, Plaintiffs, Crystol and Scott Seladoki.[1] Christian is an autistic child. His condition significantly affects his verbal and nonverbal-communication skills and his ability to interact socially. Christian also displays other characteristics often associated with autism, such as engaging in repetitive activities and having heightened or unusual responses to sensory experiences. He presently attends Augusta Levy Leaning Center, a private school for autistic students in Wheeling, West Virginia.

These proceedings relate to the Bellaire Local School District's development of an individualized education program for Christian for the 2006-2007 school year. Plaintiffs maintain that the School District failed to provide Christian with a free appropriate public education and, therefore, seek reimbursement for the tuition associated with their placement of Christian in the August Levy private school.

---

[1]     Plaintiffs now reside in Wheeling, West Virginia. (Comp., ¶ 1.)

## A. Bellaire School District

Christian attended pre-school at the Bellaire Elementary Special Needs Pre-school in Neffs, Ohio. He also participated in the School District's extended school year program. During the 2005-2006 school year, Christian attended school in the School District for one or two days before his parents placed him at a private school, the Augusta Levy Learning Center, in Wheeling, West Virginia.

During the 2005-2006 school year, the District contracted with a consultant, Katherine Palceski, who was certified to instruct and apply of a method of instruction for autistic children known as "applied behavior analysis" ("ABA") using "discrete trial training" ("DTT").[2] The ABA model was developed Dr. Ivar Lovaas, a recognized leader in the education of autistic children. A Lovaas-style ABA program relies heavily on extremely structured teaching and

---

[2]      The SLRO provided the following description of ABA:

Applied Behavioral Analysis (ABA) is the settled methodology for treating autistic children . . . . It requires a three-part sequence involving a direction from the teacher, a response from the student, and a consequence from the teacher, (either favorable or negative depending on the response). It is a research-based scientific approach to teaching autistic children. DTT requires data collection on a trial by trial format and the data is then evaluated either by a certified teacher or an ABA consultant. DTT programs involve reaching targets, such as quantitative concepts or categories, which are the pieces needed to develop a particular skill.

      ABA and DTT based approaches are also referred to as Intensive Behavioral Therapy (IBT). IBT has consistently shown to be an effective way to teach children with autism and improving their educational outcomes. There is a dispute among the experts, however, as to the amount of time of ABA/DTT required to achieve educational outcomes, to what extent a student's basic cognitive abilities affect the outcomes, and to what extent a totally DTT program limits an autistic child's socialization. Recommended numbers of hours of ABA vary from 20-40. It is generally agreed that students do not show the same gains with less than 15 hours of ABA. 20 to 40 hours of ABA does not, however, equate to 20-40 hours of DTT.

(SLRO Dec., at p. 11-12.)

comprehensive data collection and analysis. The School District hired Ms. Palceski to assist with the implementation of Lovaas-style ABA instruction for students. Ms. Palceski trained the Bellaire School District staff on the use of ABA for children with autism. When Ms. Palceski relocated to Florida in September 2006, Rick Murray was hired to replace her. Mr. Murray holds a Masters in Social work, and is also certified in ABA.

Bellaire's program for autistic children is a DTT program that uses an ABA methodology as a foundation for other services and interventions. Each child in Bellaire's ABA program who receives DTT has his or her own program book with individualized programs. Bellaire does not prescribe a set amount of ABA for any child. During DTT sessions, data is taken on a trial by trial basis. The amount of time a student spends in one-on-one DTT sessions is individualized, based on that child's performance and needs.

**B.     Augusta Levy**

Augusta Levy is a private school in Wheeling, West Virginia, established in June, 2005, solely for autistic children. Augusta Levy operates in conjunction with the Lovaas Institute in Cherry Hill, New Jersey. The programs Augusta Levy uses for its education of autistic children are derived from the curriculum developed at The Lovaas Institute. The Lovaas Institute was established by Dr. Lovaas, whose work was referenced above. Consultants from Lovaas monitor the educational programs and visit the school once a month to review its programs. In 2006, Augusta Levy had a very small student population. At the time Christian began attending classes, only seven students attended the school.

Augusta Levy is located in a facility with a Montessori school. Augusta Levy's students interact one time a week with a group of Montessori students who have received special training regarding the appropriate ways to interact with the Augusta Levy special-needs children.

Students at Augusta Levy do not receive speech and language training or occupational therapy. Christian receives private speech and language and occupational therapy services at the Easter Seals Rehabilitation Center in Wheeling.

## C.     Christian's Development at Augusta Levy

Christian showed significant progress during his first year at Augusta Levy. Christian's speech pathologist at Easter Seals, Kelly Kiziminski, noted inconsistent performances by Christian while he was registered in preschool in Bellaire, prior to his enrollment at Augusta Levy. Six weeks after his enrollment at Augusta Levy, Ms. Kiziminski noticed marked improvement in Christian's behavior. For instance, in November of 2005, Christian, for the first time, was able to follow simple directions, model gestures and play, and imitate speech. He was able to address his therapist with an appropriate greeting. By the end of the school year, however, Christian continued to exhibit serious deficits, such as echolalia,[3] screaming, tantrums and hand biting.

## D.     Bellaire's Development of IEP for Christian

In 2005-2006 school year, during which Christian was enrolled at Augusta Levy, his parents initiated a due process complaint against the School District asserting that Christian was being denied a free and appropriate public education ("FAPE"). That matter, however, was resolved by a settlement. The Settlement Agreement discharged the School District from any

---

[3]     Echolalia is a speech disorder in which the afflicted individual repeats the words made by another person. *See* http://www.websters-online-dictionary.org/definition/echolalia.

liability prior to its execution and continuing through the summer of 2006. Moreover, by its terms, Christian's parents affirmed their intent to work cooperatively with the School District to develop an individualized education program ("IEP") and to engage in a good-faith attempt to return Christian to the Bellaire public schools for the next academic year of 2006-2007. Plaintiffs agreed to attend and participate in the evaluation process to determine Christian's eligibility for special education services and to attend and participate in an IEP meeting. Christian continued to be enrolled at Augusta Levy through the summer of 2006.

The District conducted a multi-factored evaluation ("MFE") in the summer of 2006 in preparation for Christian's anticipated return to school that the academic year. The evaluation team consisted of Christian's parents; Paula Norman, the director of Special Education Services at the District; Jody Jackfert, the school psychologist; Maria Sommer, the District occupational therapist; and Lynne Fetters, the District speech/language pathologist. When it was complete, the MFE contained Ms. Jackfert's evaluation, an adaptive skills assessment prepared by Christian's parents, an assessment of basic learning language skills completed by Augusta Levy, an observation report by Ms. Hill, a medical report prepared the school nurse, a speech and language evaluation by Ms. Fetters, and an occupational therapist evaluation by Ms. Sommer.

The MFE identified Christian's academic strengths and weaknesses. His strengths included emerging writing and self-help skills. Christian also demonstrated average scores in his assessments for spelling, sight-word reading, completing puzzles and stringing beads. His weaknesses fell in the areas of adaptive skills, reading comprehension and applied problems. He was unable to be formally tested in some areas due to his behavior and poor communication skills. The team met to discuss the results of the testing on July 19, 2006. The team concluded that the

Christian was a child with a disability, namely autism, and was thus eligible for special education services. All parties who attended the MFE meeting signed the evaluation.

The School District scheduled the first IEP team meeting for August 23, 2006. Prior to that meeting, District consultants and educators prepared a summary of skills based on the MFE and documentation from Augusta Levy. They proposed goals for Christian's 2006-2007 school year at Bellaire Elementary. In addition to proposed goals, the District outlined eleven accommodations and modifications, including direct instruction, independent work space, sensory diet, and one-on-one instruction for the mastery of new tasks. The School District sent a draft IEP to Christian's mother prior to the scheduled meeting of August 23, 2007.

The IEP evaluators found that Christian was at the Kindergarten grade level. The IEP detailed his present levels of performance with respect to his motor skills, social/play, behavior, communication, cognition, and self care. The IEP noted that Christian was on a gluten-free, casein-free diet at the time and that he had been participating in a 35 hour per week ABA program at Augusta Levy since September of 2005.

In addition to the present level of performance, the IEP identified a number of goals in the areas of social/turn-taking, play and leisure, handwriting, reading/spelling, math, task-completion, group participation, independent work, communication, social-emotional behavior, independent functional self-care and following directions. Benchmarks for short term objectives were also identified. The benchmarks could further be broken down into targets for ABA/DTT programs. The IEP indicated that Christian's progress on reaching these benchmarks and goals would be charted, and the District would collect data using one-on-one intensive sequential skill acquisition techniques, such as ABA, PECS (Picture Exchange Communication System) and play therapy.

The IEP proposed that Christian would be furnished special education by a teacher and aides outside of the regular class for more than 60% of his day; speech and language training for 30 minute three times per week; and occupational therapy for 30 minutes two times per week. The IEP also contained a goal related to Christian's ability to participate in a group setting and referred to small group instruction.

The IEP meeting was held August 23, 2006. Paula Norman, Melissa Hill, Debbie McGuffin (a regular education Kindergarten teacher), Maria Sommer, Chrissy Stack (a special education preschool teacher), Kathy Fuller, Kim Callen (a representatives from Augusta Levy), Plaintiffs and their attorney attended the IEP meeting. During the IEP meeting, Plaintiffs maintained that Christian required 30 to 40 hours per week (*i.e.*, at least 6 hours per day during a 5-day school week) of ABA. Christian's parents updated Christian's present levels of performance section based on current information and their observations, but raised no additional issues about the eighteen-page IEP, its goals, benchmarks, or related services.

During the meeting, School District officials explained that the IEP offered Christian an ABA program, but they would not commit to the number of hours Christian would receive until the IEP was reviewed and all aspects of his program were finalized. Christian's parents were asked what additional services or activities they wanted Christian to receive, including recommended programs related to his speech and language skills and occupational therapy. District representatives also inquired as to whether his parents desired activities with typical peers, such as art, music, physical education, field trips and recess. Christian's parents' decision as to whether they desired these additional services was important because Christian could not receive all of these related services in addition to six hours daily of ABA, given the length of an

-8-

elementary-school day.

The IEP meeting adjourned without any of the participants signing the IEP. According to the District witnesses, they understood that the IEP team would reconvene to resolve the outstanding issues as soon as Christian's parents decided whether they wanted the IEP to include additional services and activities instead of, or in addition to, his hours spent in ABA. Christian's mother noted that there was no hurry setting up the next IEP meeting because Christian's tuition at Augusta Levy already was paid through September.

On September 8, 2006, the District sent a notice to reconvene the IEP meeting on September 20, 2006. Plaintiffs cancelled the meeting. Another IEP meeting was scheduled for September 29, 2006.

The record reflects that Christian's parents enrolled him at Augusta Levy and signed the tuition contract on September 27, 2006. Two days before they signed the contract with Augusta Levy, on September 25, 2006, Plaintiffs' attorney sent a letter to the District informing school officials that Plaintiffs had decided to continue Christian for another year at Augusta Levy. The letter indicated that Plaintiffs were placing Christian at Augusta Levy:

> [B]ecause it has become apparent that the District's offer of instruction to Christian does not include a FAPE primarily because it is not individualized to him, and because the school district wants to place Christian in special education outside the regular class only 60% of the time while his present levels of function determine that he requires 100% of his time with a special education facility.

(Exh. D-1.) The letter also advised that the District could cancel the September 29, 2006 IEP meeting.

Between September 25, 2006 and December 29, 2006, counsel for Plaintiffs and the School District corresponded in writing. In response to Plaintiffs' attorney's letter, on September 28,

2006, counsel for the School District emphasized that another IEP meeting was necessary to clarify the terms of the proposed plan, particularly with respect to ABA services, and to address any of Plaintiffs' questions. (Exh. D-43.) In a letter dated October 2, 2006, counsel for Plaintiffs indicated that they had not yet determined whether an IEP meeting was necessary and asked for clarification on the extent, including the setting and number of hours, Christian would receive one-on-one ABA under the District's proposed IEP. (Exh. D-44.) On October 11, 2006, the District's counsel responded to Plaintiffs' inquiries, explaining that the details of what the District would provide:

> [P]lease know that the District is amendable to 6-hour ABA program (subject to adjustments by the [IEP] team relative to lunch, [physical therapy], etc.). The actual physical setting of the ABA program would likely be in a smaller area conducive to such programming; however, again, the parents would have input as members of the team as to how that played out. Finally, there has been no change in the content or methodology of the District ABA program observed by Mrs. Seladoki. Again, any specific questions the parents might have can be directed to District staff at the IEP meeting.

(Exh. D-45.)

Counsel for the District sent a letter on November 3, 2006 extending another invitation to the parents to attend an IEP meeting, which the District scheduled for November 30, 2006. (Exh. D-46.) Plaintiffs' counsel sent a letter on November 9, 2006 to the School District's attorney indicating that Plaintiffs would not participate in the IEP process and intended to file a due process request to obtain a finding that the School District is financially responsible for Christian's tuition at Augusta Levy. (Exh. D-47.) On December 28, 2006, the District sent parents two revised draft IEP's, one with the related services and one without, and again expressed its willingness to provide six hours per day of ABA instruction.

Plaintiffs filed a due process request on December 29, 2006. The administrative officers found that Christian's 2006-2007 individualized education program provided him with a free appropriate public education and Plaintiffs were not entitled to reimbursement for their unilateral private placement of Christian at Augusta Levy. This lawsuit followed.

## II.

The IDEIA provides that a party aggrieved by the findings and decision of an administrative hearing officer has a right to bring a civil action in federal court. 20 U.S.C. § 1415(i)(2). Under the terms of the statute, the Court must receive the record of the administrative proceedings, hear additional evidence if the parties make such a request, and, basing its decision on the preponderance of the evidence, grant appropriate relief.[4] *Id.*

"Under IDEA, the district court uses a 'modified *de novo*' standard for reviewing state administrative determinations. This means that the district court should perform a *de novo* review, but it should give due weight to the state administrative proceedings in reaching its decision." *Doe*

---

[4] The Court notes that, in their response in opposition to Defendant's Motion for Judgment on the Administrative Record, Plaintiffs reference extrinsic materials they obtained during discovery after the administrative record was closed. Moreover, Plaintiffs frequently reference alleged events that occurred prior to the 2006-2007 period at issue during the due process hearing, which relate to matters that the parties settled by a written agreement on March 8, 2006.

Plaintiffs did not move the Court to supplement the administrative record, as required by the IDEIA, 20 U.S.C. § 1415(i)(2)(C)(ii). Instead, on March 6, 2009, Plaintiffs moved for permission to file the depositions transcripts of certain individuals that Plaintiffs obtained during post-hearing discovery on their other statutory claims. The Court denied that request on March 11, 2009. Even if the Plaintiffs' motion to file the discovery had been granted, the additional materials were not contained in the administrative record. The Court's task, for purposes of the Motion for Judgment on the Administrative Record, is limited to a review of the evidence contained in the record. The Court "should take care to limit additional evidence to what is necessary for consideration of whether the original IEP was reasonably calculated to afford some educational benefit." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 850 (6th Cir. 2005)(citation omitted). The Court, therefore, confines its analysis of the appropriateness of the administrative findings to the evidence the hearing officers considered in rendering their decisions.

-11-

*v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 386 (6th Cir. 1998) (internal quotation marks and citations omitted); *N.L. ex rel. Ms. C. v. Knox County Schs.*, 315 F.3d 688, 692 (6th Cir. 2003). The Court must make "independent decisions" based on the preponderance of the evidence, but also should give "due weight" to the determinations made during the state administrative process. *See Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). Although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe v. Metropolitan Nashville Pub. Schs.*, 133 F.3d at 387, neither may the district courts "substitute their own notions of sound educational policy for those of the school authorities which they review." *Doe v. Board of Educ. of Tullahoma City Schs.*, 9 F.3d 455, 458 (6th Cir. 1993) (quoting *Rowley*, 458 U.S. at 206). The Court should give due deference to the fact findings made during the administrative process, "particularly when educational expertise is essential to the findings." *N.L. ex rel. Ms. C. v. Knox County*, 315 F.3d at 692. "[A]dministrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich v. Board of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 567 (6th Cir. 2000). Further, the burden of proof concerning the validity and appropriateness of an IEP is on the party seeking relief, or in this case, the parents of the disabled child. *Schaffer ex rel Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

## III.

Congress enacted the Individuals with Disabilities Education Act ("IDEA") in 1970 to ensure that all children with disabilities receive "'a free appropriate public education which

-12-

emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected.'" *School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 367 (1985)(quoting 20 U.S.C. § 1400(c), now codified as amended at §§ 1400(d)(1)(A), (B)). In 1997, Congress found that the States had made substantial gains in the area of special education, but improvements were necessary to guarantee children with disabilities adequate access to appropriate services. *Forest Grove Sch. Dist. v. T.A.*, 129 S.Ct. 2484, 2491 (2009)(citing S.Rep. No. 105-17, p. 5 (1997)). Congress therefore amended the statute, now denominated the Individuals with Disabilities Education Improvement Act ("IDEIA"), "to place greater emphasis on improving student performance and ensuring that children with disabilities receive a quality public education." *Id.* at 3. Under the basic tenets of the IDEIA, children with disabilities must receive a free and appropriate public education designed to meet the individual child's needs. *Burilovich,* 208 F.3d at 565. In exchange for federal funding, the IDEIA requires states to identify, locate, and evaluate "all children residing in the State who are disabled ... and who are in need of special education and related services...." 20 U.S.C. § 1412(2)(C). States must provide these disabled children a "free appropriate public education" ("FAPE"), 20 U.S.C. § 1401(a)(18). School districts that receive funds under the IDEIA must create an IEP for each child with a disability. 20 U.S.C. § 1414(a)(5); *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2005). To provide a FAPE, a school district must offer an individualized program of special education and related services designed to meet the eligible student's unique needs. *Rowley*, 458 U.S. at 206. An IEP must "'contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating

-13-

the child's progress.'" *Deal*, 392 F.3d at 853 (quoting *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762 (6ᵗʰ Cir. 2001)).

A school district must comply with both the procedural and substantive components of the IDEIA. Here, in determining whether the School District denied Christian a FAPE, the Court must examine whether "the State complied with the procedures set forth in the Act," and second, whether the IEP was reasonably calculated to enable the child to receive meaningful educational benefits. *Rowley*, 458 U.S. at 206-07; *Deal*, 392 F.3d at 862. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 at 207.

When a public school fails to provide a FAPE and parents place the child in an private school, a court may require the public school district to reimburse the parents for the cost of education.[5] *Burlington*, 471 U.S. at 370; *Florence County School Dist. Four v. Carter*, 510 U.S.

---

[5]      The IDEIA provides as follows with respect to payment for education of children enrolled in private schools without the consent of the school district:

(i) In general

Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

(ii) Reimbursement for private school placement

If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

-14-

7 (1993); *see Forest Grove,* 129 S.Ct. at 2488 (reaffirming that IDEIA authorizes reimbursement for private special-education services when a public school fails to provide a FAPE and the private-school placement is appropriate, regardless of whether the child previously received special-education services through the public school).

Plaintiffs contend that the School District violated the IDEIA by failing to provide Christian a FAPE; by predetermining his placement at the District; by preparing an IEP that proposed goals and services that were not individualized to prepare Christian for future education, employment, and independent living; and by failing to offer him a proven educational instruction methodology based on "replicate research" – *i.e.*, the District would not provide 30-40 hours per week of ABA instruction to meet Christian's needs. (Compl., ¶ 12.) In addition, Plaintiffs allege

(iii) Limitation on reimbursement

The cost of reimbursement described in clause (ii) may be reduced or denied--
    (I)    if--

        (aa)    at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

        (bb)    10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

                                * * * *

    (III)   upon a judicial finding of unreasonableness with respect to actions taken by the parents.

20 U.S.C. § 1412(a)(10)(B); *see also* 34 C.F.R. § 300.148(d)(same).

that the District misrepresented its willingness to provide appropriate and needed services to meet Christian's unique needs while having no intention of providing any appreciable degree of intensive ABA instruction. (Compl., ¶ 13.)

A.    **Provision of a Free Appropriate Public Education**

Because Christian is autistic, he is a "child with a disability," as that term is used in the IDEIA.[6] As such, he is entitled to a FAPE. The IDEIA defines the term "free appropriate public education" as special education and related services that--

(A)    have been provided at public expense, under public supervision and direction, and without charge;

(B)    meet the standards of the State educational agency;

(C)    include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D)    are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). A school district implements a FAPE through the provision of an IEP, which is the written plan that sets out the special education and related services that are designed to meed the particularized needs of the student. The IEP is the "centerpiece of the statutes education delivery system for disabled children. . . ." *Honig v. Doe*, 484 U.S. 305, 311 (1988).

---

[6]    As set forth at 34 C.F.R. § 300.8(c)(1)(i):

Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

The paramount issue in this case, therefore, is whether the draft 2006-2007 IEP prepared by the School District was designed "to confer a 'meaningful educational benefit'" gauged in relation to Christian's potential. *Deal*, 392 F.3d at 862.

## 1.    Substance of IEP

As the Court understands their arguments, with the exception of an alleged procedural violation related to predetermination, Plaintiffs' principle claim under the IDEIA is a substantive attack of the on the sufficiency of Christian's 2006-2007 proposed IEP. As set forth above, the eighteen-page document included a statement of Christian's present education and functional levels; twelve separate measurable annual goals, including benchmarks and short-term objectives[7]; a method for tracking his progress; and an explanation of the special education and related services he would be provided. The IEP also offered Christian related services in the form of speech and occupational therapy from qualified personnel.

Plaintiffs contend, however, that the School District could not provide him with a FAPE, regardless of the terms of any IEP. They offer the testimony of Ms. Callen, who is the director of Augusta Levy, in support of their claim that the School District could not give Christian FAPE. She testified that the School District could not provide a systemic structure of discreet trial training or ABA teaching methodology within a very controlled setting. Ms. Callen, however, never observed the School District's program, nor spoke to any School District employee. She had no

---

[7]      The goals addressed areas ranging from play to academic subjects: Goal #1 - social/turn taking; Goal #2- play and leisure; Goal #3- handwriting; Goal #4- reading/spelling; Goal #5- math; Goal #6- task completion; Goal #7- group participation; Goal #8 - independent work; Goal #9- communication; Goal #10- social emotional behavior; Goal #11- independent function self-care; and Goal #12- following directions. (Def's Exh. 7.)

first-hand knowledge of the School District's ABA curriculum, and could not, therefore, render a credible opinion on whether it was appropriate for Christian.

Plaintiffs also suggest that Christian would not have made any progress under the IEP proposed by the School District. They contend that Christian's significant progress at Augusta Levy during the 2005-2006 school year, when he was exposed to intensive ABA therapy, as opposed to his lack of progress in the Bellaire pre-school system in 2003-2004 when he was three and four years old, is support for their conclusion that the School District could not provide a FAPE. Plaintiffs, however, may not establish that the proposed IEP was inadequate simply because Christian made greater progress in a different program. *See Walczak v. Florida Union Free School Dist.*, 142 F.3d 119 (2d Cir. 1998); *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1039-40 (3d Cir.1993)(child's "dramatic progress" in alternative program chosen by parents does not, by itself, establish that proposed IEP was not "reasonably calculated to enable the child to receive educational benefits" (quoting *Rowley*, 458 U.S. at 206-07)). The appropriate analysis of the adequacy of the proposed IEP is not measured by the progress Christian made at Augusta Levy. Instead, this Court must assess whether the IEP considered Christian's individualized needs and proposed a program that was reasonably calculated to provide a meaningful educational benefit.

Plaintiffs also intimate that the proposed IEP was flawed because School District's program called for contact in the elementary school with untrained peers. To be sure, the School District's elementary school serves disabled and non-disabled students. Christian would have regular exposure to other children during such activities as lunch, recess, music and gym class. The 2006-2007 proposed IEP did not require that Christian be embedded with non-disabled students; it

-18-

merely permitted him to interact "with typical peers in the natural environment." (SLRO, at p. 14.)[8]  Indeed, the IDEIA requires that, to the maximum extent appropriate, children with disabilities should be educated with children who are not disabled, and services should be provided in the least restrictive environment.  20 U.S.C. § 1412(a)(5).  Plaintiffs' position on the subject of contact with untrained peers is somewhat unclear.  Plaintiffs seem to suggest that the IEP is faulty because Christian could not interact with peers by mere exposure to them.  Yet, Plaintiffs do not contend that Christian could not have benefitted from simple interactions with non-disabled students.  More importantly, nothing in the record indicates that mere exposure to an untrained peer would deny Christian a meaningful educational benefit.

Plaintiffs assert that the inclusion of Picture Exchange Communication System ("PECS") in the IEP negated the School District's ability to provide Christian a FAPE.  PECS is used with students who are either not yet verbal or refusing to speak.  PECS can be a component of ABA in the same manner that sign language is used as a communication tool.  Plaintiffs say that PECS was ineffective for Christian, and that he was very verbal, so the use of this communication system was improper.  Plaintiffs' support for the contention that PECS did not work for Christian is the testimony of Ms. Fuller.  She claimed an unidentified teacher from the School District noted that PECS "did not work" for Christian, presumably while he was in preschool programs there at the age of three or four.  The 2006-2007 IEP which contained the suggested use of PECS in

---

<sup>8</sup>      The SLRO described noted that the Bellaire program provided DTT to students depending on their individualized needs and the amount of other educational programming, such as lunch, recess, and related services.  The SLRO also noted that the Bellaire program "also incorporates exposure to typical peers which is a critical element in the teaching of children with autism because it allows for generalization of skills in a natural environment and not just in isolated DTT sessions." (SLRO, at p. 14.)

conjunction with his ABA therapy was created months earlier, before Christian presumably advanced in his ability to speak to the extent that he was "very verbal."

Plaintiffs also assert that the IEP was deficient because it lacked a formal "behavior intervention plan." The School District was not obligated to conduct a functional behavioral assessment and develop a behavior intervention plan. Such a plan is required when a child with a disability violates a student code of conduct and is removed from his or her placement for more than ten days. 34 C.F.R. § 300.530. In this case, the Christian's proposed 2006-2007 IEP recognized that his behavior impedes his learning and contained a specific goal, Goal 10– Social Emotional Behavior– which was targeted towards increasing his ability to transition to teacher directed activities throughout the school year. A more specific behavior plan would have been impossible before Christian's educators had an opportunity to observe him and collect baseline data in his new setting.

### 2. Provision of ABA Therapy

Plaintiffs most clear objection to the IEP relates to the School District's offer to provide ABA. Plaintiffs assert that the School District offered "less than what the experts and the cases find to be [a] necessary amount of ABA." (Pl's Mem., at p. 21.) At bottom, Plaintiffs assert that the 2006-2007 IEP was inappropriate because it did not explicitly offer 30 to 40 hours of ABA instruction which would have duplicated the ABA services Christian received at Augusta Levy. Plaintiffs point to the fact that, at the time of the due process hearing, the School District provided a maximum of two hours of DTT per day to students with autism. (SLRO, at p. 14.) Two hours of DTT, however, is not equivalent to two hours of ABA. As the SLRO noted, "ABA is the umbrella under which several different interventions for children can be implemented, including

Discrete Trial Training (DTT) . . ." (SLRO at p. 11.) The School District does not prescribe a set amount of DTT hours for every child, and increases or decreases the amount of DTT sessions as appropriate based on the individualized needs of the child. (Tr. 40-41, 1044.)[9]

Significantly, the record is clear that the School District offered to provide Christian with 30 hours per week of ABA or to negotiate the number of hours depending on the amount of time Plaintiffs requested for related therapeutic services and other peer interactions. The School District was capable of providing an ABA program as it has a board certified behavior consultant, designated classrooms for the provision of DTT, and properly trained and qualified special education teachers and aides. The need for additional DTT, if any, could best be determined as Christian progressed through the school year.

Plaintiffs rely on the case of *Renner v. Board of Education of the Pub. Schools of Ann Arbor*, 185 F.3d 635, 640 (6th Cir. 1999) for the proposition that a school district must administer between 30 and 40 hours per week of ABA therapy. The court in *Renner*, however, merely recognized the recommendation of the plaintiff's expert for the provision of 30 to 40 hours of ABA to that disabled child. Ultimately, the court of appeals disagreed with this expert's opinion, and determined that the school program at issue, which incorporated DTT into only part of the day, provided the autistic child a FAPE. *Id*. at 639, 645. Plaintiffs also cite to several other cases

---

<sup>9</sup>        Plaintiffs also object to the fact that ABA was listed in the section of the IEP regarding measurement of student progress, and assert that its placement there means that the School District would not be providing ABA to Christian. Mr. Murray, the District's certified ABA consultant, explained that ABA was a component of measuring every child's progress and that the reference to one-on-one sequential skills acquisition in that section of the IEP referred to DTT. (Tr. 875, 892.) Moreover, as Mr. Murray explained, the short-term objectives in the IEP could be broken down into targets, which were drafted in the same fashion as ABA goals. (Tr. 837, 985.)

which purportedly support their position that the case law requires 40 hours of Lovaas-type ABA per week. Each of the cases cited by Plaintiffs, however, is very fact-specific and none compels the conclusion that 40 hours of ABA is mandated by law. A judicially crafted bright-line standard would vitiate the individualized assessment required under the IDEIA.

### 2.   **Predetermination**

Plaintiffs contend that, despite the fact that Christian's needs were being met at Augusta Levy, the School District predetermined his placement at the elementary school. Predetermination of a disabled child's special education services amounts "to a procedural violation of the IDEA." *Deal*, 392 F.3d at 857.

"A court should 'strictly review an IEP for procedural compliance,' although technical deviations will not render an IEP invalid." *Id*. at 854 (quoting *Dong v. Board. of Educ.*, 197 F.3d 793, 799 (6th Cir. 1999)). A school district's failure to comply with the procedural requirements of the IDEA is not a *per se* violation of the Act and only constitutes a denial of a FAPE "if such violation causes substantive harm to the child or his parents." *Knable*, 238 F.3d at 765. Substantive harm occurs when a procedural violation "seriously infringe[s] upon the parents' opportunity to participate in the IEP process." *Id*. (citations omitted). Procedural violations that deprive an eligible student of an individualized education program or result in the loss of an educational opportunity will also constitute a denial of a FAPE. *Id*. at 766. "The congressional emphasis upon full participation of concerned parties throughout the development of the IEP. . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 206. "If the procedural requirements of the IDEA are

met, greater deference is to be afforded to the district's placement decision." *Dong*, 197 F.3d at 800; *see also Deal*, 392 F.3d at 854 (same).

Plaintiffs contend that the School District was resolved to educate Christian at the public school and developed the IEP to implement this predetermined decision. The IDEIA "prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents." *N.L. ex rel. Mrs. C. v. Knox County Schs.*, 315 F.3d 688, 694 (6th Cir. 2003). On the other hand, "school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions." *Id.* Parental participation must be more that a mere formality; "'it must be meaningful.'" *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006)(quoting *Deal*, 392 F.3d at 858).

Plaintiffs also assert that the seminal case in this Circuit regarding predetermination, *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004), controls the outcome here. This Court is of a different view. In *Deal*, the court found that the school district had an unofficial policy of refusing to consider one-on-one ABA services for autistic children. In particular, the school system offered the nearly identical program to all autistic students, regardless of their needs, and rejected Lovaas-style ABA as a matter of form in favor of a teaching method in which the district had invested a substantial sum of money. *Id.* at 859. The evidence revealed that the school representatives in *Deal* had pre-decided not to offer any disabled child ABA services, regardless of the child's individual needs or the effectiveness of his or her private programs. *Id.* at 857.

-23-

Plaintiffs allege that, like *Deal*, the School District had a policy of not providing 30 - 40 hours of ABA per week because it had never before extended that amount to any other student. No evidence exists in this case that the School District had a policy to provide less than 30 hours per week of ABA. In fact, the record is clear that the School District offered 6 hours of ABA a day (30 hours per week) for Christian. The School District attempted to discuss this option with Plaintiffs, but needed additional information from the parents regarding additional services for Christian. *Deal* is also distinguishable because, here, the record is devoid of any evidence that the School District's proposed placement was motivated by a financial investment in a particular teaching method or that it refused to consider any particular methodology. Moreover, the IEP proposed for Christian included the ABA services Plaintiffs seek.[10]

Plaintiffs also contend that predetermination can be inferred from the fact that the School District rejected data from Augusta Levy. First, the School District did not reject all data and actually considered the written assessment of basic learning language skills completed by Augusta Levy when it first conducted Christian's multi-factored evaluation before preparing the IEP. Second, representatives from Augusta Levy were intricately involved in the initial, and only, IEP meeting, and provided their assessments and observations of Christian at during his previous year at the private school.

---

[10]     *Spielberg ex rel. Spielberg v. Henrico Cty. Pub. Sch.*, 853 F.2d 256 (4th Cir. 1988), cited by Plaintiffs, is inapposite. In *Speilberg*, the school district funded a nineteen-year old student's education at a private school for eight years. In the spring of the eight year, the school conducted a reevaluation, just nine months after the previous one, that focused on returning the student to the public school. *Id*. at 257. The record there also contained evidence of correspondence dated before the IEP meeting that focused on moving the student to public placement. *Id*. at 258. No similar evidence is present in this case.

-24-

Plaintiffs contend that the parents' input was not considered as it relates to the development of the IEP. The Court rejects this assertion as unsupported by the record. Plaintiffs, their attorney, and representatives from Augusta Levy all attended and participated in the IEP. The facts of this case regarding parental involvement are significantly different from *Deal* wherein the plaintiffs demonstrated that their participation in the IEP meeting was wholly meaningless because the school district had predetermined the disabled child's placement.

Finally, Plaintiffs assert that the School District's predetermined intention to place Christian in public school is evidenced by the fact that they received, to their surprise, re-enrollment forms among the documents for consenting to the multi-factored evaluation before District officials developed a proposed IEP. Even if the School District would have suggested private placement at Augusta Levy in the IEP, Christian would have been required to be enrolled in the public school system to receive reimbursement. Further, re-enrollment forms were consistent with the parties' Settlement Agreement, executed a five months earlier, that indicated Plaintiffs would work in good faith to return Christian to the Bellaire school system.

**B.     Reimbursement and Parental Cooperation**

As previously stated, school authorities may be obligated "to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Burlington*, 471 U.S. at 369. The administrative hearing officers concluded that Plaintiffs were not entitled to any reimbursement for the costs of educating Christian at Augusta Levy because the School District offered him a FAPE and because Plaintiffs did not work in good faith on the 2006-2007 IEP. Plaintiffs assert this finding is erroneous and they are not responsible for the School District's

-25-

failure to develop an IEP that offered a FAPE.

The hearing officers' conclusions that Plaintiffs failed to remain engaged in the IEP process is supported by evidence of record. The IDEIA requires a cooperative process in which parents and the school district work together to make decisions regarding a disable child's placement. A parent's right to seek reimbursement for a placement of their child in a private school is available only upon a finding that, after cooperating with the school district, there are "sufficiently serious procedural failures by the school district." *Doe v. Metropolitan Nashville Pub. Schs.*, 133 F.3d 384, 388 (6th Cir. 1998); *see Patricia P. v. Board of Educ. of Oak Park*, 203 F.3d 462, 468 (7th Cir. 2000)(recognizing that reimbursement under the IDEA is subject to the parties cooperating in the placement process). Here, Plaintiffs disengaged from the IEP process after the first meeting in August 2006, and failed to collaborate further with the School District regarding Christian's placement decisions.

By the terms of a previous Settlement Agreement, Plaintiffs agreed to work in good faith with the School District to return Christian to the public school for the 2006-2007 school year, including a commitment to attend an IEP meeting in mid-August. Plaintiffs appeared at the IEP meeting on August 23, 2006, and informed the School District that Christian would need at least 30 hours of ABA per week. The School District offered Christian ABA, but could not commit to the number of hours until the IEP was reviewed and all aspects of his program were determined. The School District asked Plaintiffs what other services and activities they wanted Christian to receive, including recommended speech and language services and occupational therapy. Plaintiffs

adjourned the meeting.[11] They never responded to the School District's inquiry about other services for Christian. The School District attempted to schedule another IEP meeting for September 20, 2006 by an invitation dated September 8, 2006. Plaintiffs canceled that meeting. On September 25, 2006, Plaintiffs counsel sent a letter instructing the School District to cancel a rescheduled IEP meeting. Two days later, on September 27, 2006, Plaintiffs signed the 2006-2007 contract with Augusta Levy.[12] On November 6, 2006, the School District sent Plaintiffs another invitation to an IEP meeting. Plaintiffs did not respond. Plaintiffs' counsel sent a letter on November 9, 2006 to the School District's attorney indicating that Plaintiffs would not participate in the IEP process and intended to file a due process request. On December 28, 2006, the District sent parents two revised draft IEP's, one with the related services and one without, and again expressed its willingness to provide six hours per day of ABA instruction. Plaintiffs did not respond, other than to file their due process request.

According to the administrative hearing officers, Plaintiffs showed no inclination to work cooperatively with the School District after attending the initial IEP conference. Plaintiffs have referred to no contrary evidence to demonstrate that they remained cooperative. As such, the Court finds no basis on which to overturn the administrative conclusions in this regard.

---

[11]     Prior to adjournment, Plaintiffs did not inform the School District that they were rejecting the proposed IEP, state their concerns or declare their intention to enroll Christian in a private school, as required by 34 C.F.R. § 300.148(d)(1)(i). Plaintiffs did not sign the IEP. Mrs. Seladoki testified that she believed her failure to sign the IEP was an expression that she was rejecting it. (Tr. 618.)

[12]     24 C.F.R. § 300.148(d)(1)(ii) requires parents to provide at least ten (10) business days written notice to the public school if they intend to enroll their child in a private school at public expense.

## C.    Conclusion

For the foregoing reasons, the Court finds Plaintiffs' challenges to the administrative hearing officers' conclusions to be without merit. Upon *de novo* review, giving due deference to the expertise of the educators' determinations, the Court finds that the preponderance of evidence demonstrates that Christian's proposed 2006-2007 IEP was reasonably calculated to provide a meaningful educational benefit. The School District has, therefore, satisfied its obligation to provide a FAPE to Christian in the least restrictive environment. The IEP goals were individualized, and the proposed methodology was research-based ABA instruction. Further, the Court finds that the School District complied with the procedures set forth in the IDEIA. The School District's proposed placement of Christian in the public school setting was not predetermined. Plaintiffs are, accordingly, not entitled to reimbursement for the cost of tuition at Augusta Levy.

The Court therefore **AFFIRMS** the administrative decisions, and Defendant's Motion for Judgment on the Administrative Record is **GRANTED**.

## IV.

In Count II, Plaintiffs allege that Christian is a disabled person within the meaning of the Rehabilitation Act and was entitled to a FAPE, but that the School District failed to accommodate his disability or provide special education and related aids. In Count III, Plaintiffs allege that Christian is a disabled person for purposes of the ADA, and again assert that the School District denied him a FAPE in violation of that statute. In Count IV, Plaintiffs allege, *inter alia*, that the School District, acting under color of state law, deprived them of their federally guaranteed rights under the IDEIA, the Rehabilitation Act, and the ADA in violation of Section 1983. Defendant

-28-

moved for judgment on the pleadings as to each of these statutory claims under Federal Rule of Civil Procedure 12(c). In response to the Motion, however, Plaintiffs, however, refer to matters outside the pleadings, and suggest that the Court convert Defendant's Motion for Judgment on the Pleadings to one for summary judgment.

Rule 12(c) provides that "[a]ter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." When one or both parties present matters outside the pleadings in conjunction with a Rule 12(c) motion, the Court may, at its discretion, either consider these matters and convert the motion to one for summary judgment or exclude the extra-pleading materials and apply the standard set forth in Rule 12(c). *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 503 (6th Cir. 2006). Rule 12(d) requires that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." At the time the instant Motion was filed, both parties requested an opportunity to present all additional materials pertinent to a motion for summary judgment, if the Court was inclined to convert it.

The School District moves for judgment under Rule 12(c) citing, primarily, alleged pleading deficiencies. The School District, relying on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), asserts that the statutory claims should be dismissed because they contain no more than "labels and conclusions [and] formulaic recitation[s] of the elements of the cause[s] of action." The Court, however, is disinclined to dismiss Plaintiffs' statutory claims on the basis of pleading deficiencies that could be remedied by amendment, which should be freely given when

-29-

justice so requires. Fed. R. Civ. P. 15(a)(2).

Instead, in this case, the Court concludes that Plaintiffs' remaining statutory claims should be addressed under the scope of Federal Rule of Civil Procedure 56(c) for summary judgment. The Court's determination of the School District's procedural and substantive compliance with the IDEIA presumably impacts portions, if not all, of Plaintiff's statutory claims. Insofar as Plaintiffs' Complaint alleges that the School District violated Christian's rights under these statutes by failing to provide him with a free appropriate public education, Defendant could argue that the claims fail because, as the Court has already determined, the School District did not deny Christian a FAPE. *See Soraruf v. Pinckney County Schs.*, No. 98-2052, 2000 WL 245501 *4 (6th Cir. 2000)(per curiam)(finding that because school district did not violate plaintiff's right to a FAPE, it did not violate rights under Rehabilitation Act, ADA or Section 1983).

The Court, therefore, gives notice of its intention to convert Defendant's Motion for Partial Judgment on the Pleadings to one for summary judgment. Although the Court believes that the both Plaintiffs and Defendant have had ample opportunity to supplement the record, in an abundance of caution, Defendant will be granted leave supplement and may formally move for summary judgment on Plaintiffs' claims under the Rehabilitation Act, ADA and Section 1983. Plaintiffs will also be granted leave to present materials that are pertinent to summary judgment on these remaining claims. Defendant may have **TWENTY-ONE (21) DAYS** from the date of this Opinion and Order in which to file its Motion. Plaintiffs and Defendant may therefore file their Memorandum in Opposition and Reply, respectively, within the time permitted by rule.

## V.

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record as to Count I is **GRANTED**. The Court gives notice of its intent to convert Defendant's Motion for Partial Judgment on the Pleadings to one for summary judgment, and the parties are permitted leave to supplement the record as to Plaintiffs' remaining statutory claims. Defendant's Motion for Partial Judgment on the Pleadings is, therefore, **DENIED AS MOOT**, as the Court will analyze these claims under Rule 56.

**IT IS SO ORDERED.**

9 - 28 - 2001
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**